**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMES LOTT,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **THOMAS JEFFERSON UNIVERSITY,** | **NO.  18-4000** |
| **Defendant.** | |

**DuBois, J.**                                                              **October 19, 2020**

**M E M O R A N D U M**

## I.      INTRODUCTION

In this employment discrimination case, plaintiff James Lott alleges that his former employer, Thomas Jefferson University ("TJU") discriminated and retaliated against him on the basis of his disabilities—Attention Deficit Hyperactivity Disorder ("ADHD") and his history of methamphetamine addiction—and failed to accommodate his disability-related needs.  Plaintiff asserts claims of disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*. ("ADA") and the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq*. ("PHRA"); retaliation under the ADA, PHRA and Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq*. ("FMLA"); and failure to accommodate under the ADA and PHRA.  Presently before the Court is Defendant Thomas Jefferson University's Motion for Summary Judgment. For the reasons set forth below, the Motion is denied.

## II.      BACKGROUND[1]

"Plaintiff began his employment with [defendant] in or about November 2011." Pl.'s Resp. Def.'s Statement Mat. Facts ("Pl.'s Resp. Def.'s SMF") ¶ 1.  "Beginning in January 2016,

---

[1] The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such. Where appropriate, plaintiff and the defendants' statements of material facts are cited in lieu of a direct citation to the record.

Plaintiff began having attendance difficulties resulting from his escalating abuse of methamphetamine." *Id.* ¶ 6.  As a result, plaintiff's supervisor, Kristan Davis issued several verbal and written disciplinary warnings to plaintiff in May and June 2016.  *See id.* ¶¶ 11-22. Shortly thereafter, plaintiff applied for FMLA leave to seek treatment for his methamphetamine abuse.  *See id.* ¶ 27.

On June 15, 2016, plaintiff spoke with a Human Resources representative at TJU about taking FMLA leave.  *See id.* ¶¶ 27-29.  After this conversation, he was sent to University Health Services ("UHS") for a fitness for duty evaluation and a drug screening.  *See* Def.'s Statement Mat. Facts ("Def.'s SMF") ¶¶ 31, 36.  While at UHS, plaintiff met with Dr. Ellen O'Connor and "disclosed that he had recently been abusing methamphetamines; that he had been treated in the past for methamphetamine addiction; that he had been using methamphetamines on and off, but more recently for the previous year. . . ."  Pl.'s Resp. Def.'s SMF ¶ 33; O'Connor Dep., 18:24-20:5.  Plaintiff also disclosed that he had "a past medical history of hypertension, ADHD, anxiety and depression" and that he was taking Adderall and Klonopin to treat these conditions, as prescribed by his primary care provider.  *See* Lott Dep. 129:6-130:7.  Plaintiff's drug screening returned positive results for methamphetamine.  Pl.'s Resp. Def.'s SMF ¶ 36; Def.'s SMF ¶ 54.  Plaintiff was subsequently approved to take FMLA leave from June 15, 2016 to July 22, 2016.  *See id.* ¶ 60.

### A.  Plaintiff's Treatment at the Livengrin Foundation

On June 22, 2016, plaintiff was referred to the Livengrin Foundation ("The Foundation"), where he was diagnosed with substance use disorder and enrolled in a treatment program.  *Id.* ¶¶ 47-48.  "The Foundation gave Lott a welcome packet . . . which explained that The Foundation is an 'abstinence based program' and included a list titled 'MEDICATIONS THAT MUST BE

AVOIDED.'" *Id.* ¶ 49; Def.'s Ex. 21 (capitalization in original). Adderall, an amphetamine, was on that list. *See* Def.'s Ex. 21. Plaintiff testified that, in accordance with this restriction, he refrained from taking Adderall for the duration of his treatment at The Foundation. *See* Lott Dep., 186:22-187:19. "Plaintiff participated in therapy sessions three times per week." Pl.'s Resp. Def.'s SMF ¶ 51.

Plaintiff also testified that at the time of his enrollment, The Foundation recommended that he participate in the intensive outpatient program (IOP) and told him that they would determine whether he needed further treatment upon his completion of the IOP. *See* Lott Dep. 173:5-20. On the other hand, defendant contends that The Foundation "informed Lott early on in treatment that he was expected to enroll in the general outpatient program (GOP) after the IOP was complete." Def.'s SMF ¶ 52. Plaintiff never received a written treatment plan, but rather The Foundation communicated his treatment plan to him orally. *See* Lott Dep., 173:2-4; 183:12-21.

### B. Plaintiff's Return to Work/Last Chance Agreement

"On July 12, 2016, Lott contacted [Debra] Dix[2] to tell her he wanted to return to work while he continued with his treatment." Def.'s SMF ¶ 62. Based on his conversation with Dix, "[p]laintiff understood that his employment depended upon whether he continued with his treatment plan and graduated from that treatment plan." Pl.'s Resp. Def.'s SMF ¶ 64. "On July 20, 2016, [p]laintiff met with O'Connor to discuss his anticipated return to work." *Id.* ¶ 69. "Plaintiff informed O'Connor that he was off all prescription medication as a condition of his participation in the IOP at [The Foundation]." *Id.* ¶ 72. He "also voluntarily submitted to another drug screening and tested negative for amphetamines and methamphetamine." Def.'s SMF ¶ 76.

---

[2] Dix was an Employee Assistance Program (EAP) counselor, who worked for First Call, an EAP provider to TJU. *See* Def.'s SMF ¶ 46. "While Lott was in the IOP program, Dix acted as an intermediary between The Foundation and O'Connor to keep her apprised of Lott's progress." *Id.* ¶ 61.

3

"Based on Lott's progress to that point, [a letter from The Foundation] authorizing Lott to return to work, and Lott's affirmative representation that he would continue to follow The Foundation's treatment plan, Dr. O'Connor authorized Lott's return to work."  *Id*. ¶ 77.

"August 1, 2016 was Lott's first day back at work after his FMLA leave." *Id*. ¶ 78.  On August 5, 2016, Aaron Sniderman, Human Resources Business Partner at TJU, presented plaintiff with a Last Chance Agreement (LCA), which he signed.  Pl.'s Resp. Def.'s SMF ¶ 87; Sniderman Dep., 35:23-36:3.  The Last Chance Agreement provided, in relevant part:

> 1. Mr. Lott will, for a period of one (1) year from the date of this Memorandum of Agreement, be subject to random evaluations by University Health Services.  Such evaluations may include taking of blood and/or urine to perform drug and alcohol screening tests.  Additionally, Mr. Lott agrees that failure to comply with this paragraph will be grounds for immediate termination from employment with Jefferson.
>
> 2. Mr. Lott will follow the program of treatment set forth by his treating provider and understands that failure to follow the program will result in termination from employment with Jefferson.
>
> 3. Mr. Lott will provide a copy of all recommendations and conditions of treatment or requirements for participation in any program of rehabilitation to University Health Services.  Moreover, Mr. Lott will follow the recommendations and conditions of treatment set forth and understands that failure to follow them will result in termination from employment at Jefferson.
>
> 4. Mr. Lott will notify University Health Services of any changes to the recommendations and conditions of treatment and understands that failure to do so will result in termination from employment at Jefferson.

Def.'s Ex. 27.  "Before Lott signed the LCA, he understood that, if he were called for random drug screening, he would be expected to report for testing as soon as possible."  Def.'s SMF ¶ 85; *see* Lott Dep. 197:19-198:12.

### C.  Plaintiff's Completion of the Intensive Outpatient Program at The Foundation

"On August 15, 2016, Plaintiff successfully completed the intensive outpatient program with [The Foundation]."  Pl.'s Resp. Def.'s SMF ¶ 92 .  "Near the end of the program," plaintiff claims that his "primary therapist commenced a leave of absence, which resulted in confusion as to [p]laintiff's continued treatment needs."  *Id*.; *see* Lott Dep. 216:23-24-217:1-3.  Defendant asserts, however, that plaintiff was expected to continue treatment at The Foundation after completing the IOP.  In support of this contention, defendant provides an email that Dix sent O'Connor on September 1, 2016, which states,

> J.L. completed IOP and the recommendation was for him to continue in O/P.  He stated he did not want to continue.  The program has outreached to him twice, and will continue to do so for the next few weeks.  If they can't reach him, or he refuses to continue with treatment, they will discharge him as non-compliant at that time.

Def.'s SMF ¶ 92; Def.'s Ex. 39; Dix. Dep., 39:18-41:23.  Plaintiff testified, however, that he did not learn of The Foundation's recommendation that he continue his treatment through a general outpatient program until he reached out to them on September 7, 2016.  *See* Lott Dep., 341:7-18.  Plaintiff claims that, shortly thereafter, he reviewed The Foundation's GOP schedule, and "realized that the schedule would conflict with the college courses that he was taking in the evening through Jefferson University, and as such he researched other treatment facilities, including Rehab After Work."  Pl.'s Resp. Def.'s SMF ¶ 145.[3]

### D.  Plaintiff Reports to UHS for Drug Testing

On Friday, September 2, 2016, "Barbara Symons, a UHS Nurse Practitioner, called Lott to appear for a drug screen in accordance with the LCA."  *Id*. ¶ 95.  "Plaintiff was out of the office

---

[3] The first time that plaintiff visited Rehab After Work was on September 20, 2016.  *See* Lott Dep., 188:15-20.  Plaintiff testified that "the intake counselor" at Rehab After Work, whom he met with during his visit, told him that he could take Adderall as part of their program.  *See* Lott Dep., 195:3-196:12.

on vacation for the Labor Day holiday" and did not answer the call.  Pl.'s Resp. Def.'s SMF ¶ 95.  On Tuesday, September 6, 2016, "Plaintiff returned Symon's [sic] call as soon as he received the voicemail."  *Id*.  Symons made a record of her calls with plaintiff.  *See* Def.'s Ex. 45; Symons Aff. ¶¶ 7-8.  Her September 6, 2016 telephone record, which reflects that plaintiff called at 9:30 AM, states, in relevant part, "he is in back to back meetings/class presentations all day today, until 5 pm.  We will expect to see him 9/7/2016 7:30."  Def.'s Ex. 45.  Symons confirmed the details of her conversation with plaintiff in her affidavit—specifically, that plaintiff claimed he was unavailable to report for a drug screen until 5 PM on September 6, and that she told him to instead report the next day at 7:30 AM.  Symons Aff.  ¶¶ 7-11.  Plaintiff, on the other hand, denies telling Symons that he was unavailable until after 5 PM on September 6, 2016.  *See* Lott Dep., 226:14-24.  Plaintiff further denies that Symons told him to report to UHS the next day at 7:30 AM.  *See id*. 235:3-17.  Plaintiff testified, "if she told me I had to be in at 7:30 I would have been there at 7:30."  *Id*. 235:3-5.

Kristan Davis stated in her affidavit that on the morning of September 7, 2016, plaintiff informed her that he had to report to UHS.  Davis Aff. ¶ 30.  She claims that she relieved plaintiff from his job duties no later than 8:49 AM to accommodate this request.  *Id*. ¶¶ 32-33.  Around 10 AM, O'Connor "called Sniderman to inform him that Lott had not reported to UHS as scheduled."  O'Connor Aff. ¶¶ 45-46.  Shortly thereafter, Sniderman went to plaintiff's desk and "informed him that he needed to go to be tested."  Pl.'s Resp. Def.'s SMF ¶ 113.  "Plaintiff immediately complied."  *Id*.

At 11: 08 AM that same day, O'Connor sent an email to Sniderman to inform him that plaintiff may have violated the LCA.  *See* Def.'s Ex. 33.  She posited that plaintiff's "failure to test" and "non-compliance with his treatment program" could qualify as violations of the LCA.

*See* Def.'s Ex. 33.  Sniderman's eventual decision to terminate plaintiff's employment was based on these alleged violations.  *See infra* Part II.F; Def.'s SMF ¶ 162; Sniderman Dep., 52:1-24-53:9.

### E.  Plaintiff Tests Positive for Adderall

On September 12, 2016, O'Connor notified plaintiff that his September 7th drug screen returned positive results for Adderall.  *See* Pl.'s Resp. Def.'s SMF ¶ 133.  "Plaintiff reminded Dr. O'Connor that he utilized Adderall as prescribed as treatment for ADHD,[4] and provided his prescription bottle to Dr. O'Connor as verification."  *Id.*  Although plaintiff had not been taking Adderall during his participation in the IOP, "[p]laintiff understood that he was permitted to resume taking prescribed Adderall after his completion of his treatment program with [The Foundation]."  Pl.'s Resp. Def.'s SMF ¶ 133.  "Plaintiff resumed utilizing his prescribed Adderall to assist him with the completion of his job duties, which he found difficult to perform without."  *Id.* ¶ 148.  Defendant asserts that "there is no evidence that anyone from TJU believed Lott could restart Adderall after he graduated from the IOP."  Def.'s SMF ¶ 143.

### F.  Plaintiff is Terminated by Defendant

"Sniderman decided to terminate Lott's employment on September 21, 2016, for his multiple violations of the LCA."  Def.'s SMF ¶ 162.  Specifically, Sniderman stated that he terminated plaintiff "for failing to report to UHS in a timely fashion for his random drug screening and for failing to following [sic] the treatment plan of his treating provider, The Foundation."  Sniderman Aff. ¶ 15.  Plaintiff denies, however, that any of his conduct prior to his termination

---

[4] Plaintiff's primary care physician, Dr. Mark Watkins, stated that the last Adderall prescription he had written for plaintiff—dated June 6, 2016—was for a 90-day supply.  *See* Watkins Aff. ¶ 6.  He further stated, "I did not know or have any indication, prior to ever prescribing Mr. Lott Adderall, that Mr. Lott had a methamphetamine substance abuse problem or had ever used a methamphetamine."  *Id.*

violated the terms of the LCA "or that his termination was based upon any alleged violation of the LCA."  Pl.'s Resp. Def.'s SMF ¶ 162.

On September 17, 2018, plaintiff filed a three-count Complaint, alleging claims of disability discrimination, failure to accommodate and retaliation under the ADA (Count I) and the PHRA (Count II), and a retaliation claim under the FMLA (Count III).  On November 25, 2019, defendant moved for summary judgment on all counts.  Plaintiff responded on January 6, 2020. Defendant replied on January 16, 2020.  The Motion is thus ripe for decision.

### III.   LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.*  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

8

IV.    **DISCUSSION**

**A.  Plaintiff's Disability Discrimination Claims Under the ADA and PHRA**

In Counts I and II, plaintiff alleges discrimination claims under the ADA and the PHRA,

respectively.  Both of plaintiff's discrimination claims "are subject to the three-part burden-

shifting framework set out in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) and can

be analyzed together."  *Williams v. Pa. Hosp. of Univ. of Pa. Health Sys.*, No. CV 17-2413, 2018

WL 4491337, at *8 (E.D. Pa. Sept. 18, 2018) (citing *Taylor v. Phoenixville School Dist.*, 184

F.3d 296, 306 (3d Cir. 1999) ("our analysis of an ADA claim applies equally to a PHRA

claim")).  Under the *McDonnell Douglas* framework, plaintiff has the initial burden of

establishing a *prima facie* case of discrimination.  *See* 411 U.S. at 802.  If plaintiff succeeds, the

burden shifts to the employer, who must articulate "some legitimate, nondiscriminatory reason"

for the adverse employment action.  *Id*.  Then, the burden shifts back to plaintiff to prove that the

employer's proffered reasons are a pretext for discrimination.  *Id*. at 804.  The "plaintiff at all

times bears the 'ultimate burden of persuasion.'"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

511 (1993).

1.  *Plaintiff's* Prima Facie *Case*

The ADA prohibits covered employers[5] from discriminating against qualified individuals

on the basis of disability.  *See* 42 U.S.C. § 12112(a).  To establish a *prima facie* case of disability

discrimination, a "plaintiff must show (1) that he is disabled within the meaning of the ADA,

(2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3)

that he was subjected to an adverse employment decision as a result of discrimination."  *Sulima

v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).  In this case, the parties agree that

---

[5] It is undisputed that TJU is covered by the ADA.

9

plaintiff was qualified to perform his job, and that his termination constituted an adverse employment decision. *See* Pl.'s Mem. L. Opp. Def.'s Mot. Summ. J. ("Pl.'s Mem. Opp."), 13. Thus, the Court focuses its inquiry on whether, at the time of his termination,[6] plaintiff was "disabled" under the ADA.

To be considered "disabled" under the ADA, a plaintiff must show that (1) he has a physical or mental impairment that substantially limits one or more of his major life activities,[7] (2) he has a record of such an impairment, or (3) he is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2). Plaintiff advances arguments under prongs (1) and (3) of this definition. The Court finds that plaintiff has adequately demonstrated that he was "disabled" under prong (1) and thus does not evaluate his argument under prong (3)—that is, whether defendant regarded him as having an impairment.

Defendant does not dispute that plaintiff's former methamphetamine addiction "substantially impair[ed] one or more of his major life activities, including, but not limited to, thinking, concentrating, and interacting with others." Compl. ¶ 14. However, defendant contends that plaintiff was not "disabled" because Section 12114(a) of the ADA specifically excludes "any employee or applicant who is currently engaging in the illegal use of drugs" from its definition.[8] 42 U.S.C. § 12114(a); *see* Def.'s Brief Supp. Mot. Summ. J. ("Def.'s Brief"), 5. Plaintiff, on the other hand, contends that he was "disabled" under the ADA's safe harbor provision, which protects from the Section 12114(a) exclusion an individual who:

> (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has

---

[6] "[W]hether a person was a 'qualified individual with a disability'. . . [is examined] from the point at which the alleged discriminatory decision was made." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535-36 (3d Cir. 2007) (citations omitted).

[7] Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

[8] Defendant concedes that plaintiff was disabled within the meaning of the ADA with respect to his ADHD. *See* Def.'s Brief, 9 n.4.

otherwise been rehabilitated successfully and is no longer engaging
in such use;
(2) is participating in a supervised rehabilitation program and is no
longer engaging in such use; or
(3) is erroneously regarded as engaging in such use, but is not
engaging in such use.

42 U.S.C. § 12114(b).  Plaintiff argues that he was entitled to the safe harbor protection because,

at the time of his termination, he was no longer engaging in the illegal use of drugs and he had

successfully completed a supervised drug rehabilitation program.  The Court assesses each of these

arguments in turn, and concludes that both depend on material facts about which there is genuine

dispute.

a.   "Currently Engaging in the Illegal Use of Drugs"

The regulations accompanying the ADA provide that "[t]he term 'currently engaging' is

not intended to be limited to the use of drugs on the day of, or within a matter of days or weeks

before, the employment action in question."  29 C.F.R. § 1630.3 App..  "Rather, the provision is

intended to apply to the illegal use of drugs that has occurred recently enough to indicate that the

individual is actively engaged in such conduct."  *Salley v. Circuit City Stores*, No. 96-6368, 1997

WL 701302, at *6 (E.D. Pa. Oct. 29, 1997), *aff'd on other grounds*, 160 F.3d 977 (3d Cir. 1998).

In the employment context, "currently engaging in the illegal use of drugs" is defined by

reference to the employer's perspective.  Specifically, current use of illegal drugs includes that

which "bears a temporal relationship to the employment action such that an employer may

reasonably conclude at the time of the employment action that illegal drug use is an ongoing

problem."  *Law v. Garden State Tanning*, 159 F. Supp. 2d 787, 793 (E.D. Pa. 2001); *see also*,

*Salley* 1997 WL 701302, at *7.  In evaluating the reasonableness of an employer's conclusion

that an employee's drug use was an ongoing problem, courts have considered the length and

11

severity of the employee's history of drug abuse.  *See Law*, 159 F. Supp. 2d at 793 (concluding that employer's decision was reasonable, in part, because of plaintiff's 29-year history of addiction); *Zenor v. El Paso Heathcare Syst., Ltd.*, 176 F.3d 847, 857 (5th Cir. 1999) (finding that plaintiff's use of cocaine as much as five times a week for approximately two years amounted to a "severe drug problem"; concluding that five weeks constituted a "short period of abstinence," which "did not remove from the employer's mind a reasonable belief that the drug use remained a problem").  In this case, the Court considers these same factors in assessing defendant's conclusion that plaintiff's drug use was an ongoing problem.

It is undisputed that plaintiff had not used illegal drugs in over three months at the time of his termination.[9]  *See* Def.'s Brief, 7.  Nevertheless, defendant contends that "[t]hree months was recent enough to justify a reasonable belief that his drug abuse was still a problem, especially in light of his years of addiction."  *See id.*  Dr. O'Connor lists in her affidavit several factors upon which she relied in determining that plaintiff's substance abuse was an ongoing problem.[10]  However, none of these factors reference the specific duration of plaintiff's history of drug abuse, the severity of his addiction, or the temporal relationship between the last time he tested positive for methamphetamines and when he was terminated.  Indeed, other than Dr. O'Connor's notes from plaintiff's fitness for duty evaluation, conducted three months prior to his termination—stating, in relevant part, "[s]ubstance abuse treatment in Michigan 10 yrs. ago. Methamphetamines. Recovery 5 years. Some use in past 5 years but [increased] over past year."—the record supplies no relevant evidence upon which Dr. O'Connor could have relied in

---

[9] Prior to the date of his termination, September 21, 2016, the last time plaintiff tested positive for methamphetamines was on June 15, 2016. *See* Part II, *supra*.

[10] "[G]iven Lott's long history abusing methamphetamine, his delay in coming to UHS for a drug screen, his failure to enroll in the GOP at The Foundation, and his decision to resume taking Adderall. . . I concluded that Lott's substance abuse was an ongoing problem for him." O'Connor Aff. ¶ 79.

concluding that plaintiff's drug abuse was an ongoing problem.  Thus, based on the current state

of the record the Court cannot conclude as a matter of law that defendant's belief was

reasonable, and that plaintiff was "currently engaging the illegal use of drugs" at the time of his

termination.

    b. "Successfully Completed a Supervised Drug Rehabilitation Program"

   Defendant further argues that plaintiff was not protected by the ADA's safe harbor

provision at the time of his termination, because he "failed to follow his treatment plan when he

declined to enroll in a general outpatient program ('GOP') after completing the intensive

outpatient program ('IOP') at The Foundation and when he resumed taking Adderall at the end

of August 2016."  Def.'s Brief, 8.  However, this claim is supported entirely by facts about which

there is genuine dispute.

   First, defendant asserts that because plaintiff did not enroll in the GOP at The Foundation

after completing the IOP, plaintiff failed to comply with his treatment program.[11]  *See id.*

However, plaintiff presents ample evidence in support of his claim that his enrollment in the

GOP was not a condition of his treatment plan at The Foundation.  *See* Lott Dep., 173:5-20

(testifying that at the time of his enrollment at The Foundation, he was told that further treatment

needs would be determined after he completed the IOP); Lott Dep., 218:2-24-219:1-18

(testifying that at the conclusion of the IOP he was not told by anyone at The Foundation that he

was expected to enroll in the GOP); Lott Dep., 173:2-4 (testifying that he never received a

written plan from The Foundation but that his treatment plan was communicated to him orally).

   Defendant cites *Law v. Garden State Tanning* as the legal basis for its argument that

plaintiff did not comply with his treatment program.  159 F. Supp. 2d 787 (E.D. Pa. 2001).

---

[11] The LCA required plaintiff to follow the "recommendations," in addition to the requirements, of his treatment provider. *See* Part II.C *supra*; Def.'s Ex. 27.

However, the facts of *Law* are distinct from those in this case.  In *Law*, the court found that plaintiff had failed to complete his drug rehabilitation program because he dropped out of a 14-day inpatient program after just one day.  *See id.* at 790-92.  In this case, plaintiff completed the IOP at The Foundation—the only treatment plan in which he was required to enroll, by his understanding at the time—and was not enrolled in any treatment program at the time defendant deemed him noncompliant.  Although defendant maintains that plaintiff disregarded The Foundation's recommendation that he continue in the GOP after completing the IOP, the record establishes that this issue is disputed.

Second, defendant argues that plaintiff violated the terms of his treatment plan by taking Adderall.  Defendant claims that plaintiff knew that "The Foundation had instructed him that, as a recovering addict, he must avoid taking Adderall because it would put him at risk of relapse. . . ."  Def.'s Brief, 8 (emphasis omitted).  However, plaintiff testified that he believed that after he completed the IOP—and before he learned of The Foundation's recommendation that he enroll in the GOP—he could resume taking Adderall to treat his ADHD.  *See* Lott Dep., 207:12-21.  He also testified that upon returning to work, he found it difficult to complete his job duties without taking Adderall, given his ADHD diagnosis.  *See id.*, 288:10-15.  Further, the LCA was silent as to whether plaintiff was prohibited from taking prescription medication.  *See* Def.'s Ex. 27.  Thus, in light of the uncertainty surrounding plaintiff's continued treatment needs and the conditions of his employment, *see infra* Part IV.2.b, the Court determines that there is a genuine dispute as to whether plaintiff's use of Adderall prevented him from "successfully completing" his drug rehabilitation program.

Therefore, the Court determines that a reasonable jury could find that plaintiff was not "currently engaging in the illegal use of drugs" and that—despite his failure to enroll in the GOP

and his decision to resume taking Adderall—plaintiff had "successfully completed a supervised drug rehabilitation program."  Accordingly, plaintiff has met his initial burden of establishing a *prima facie* case of "disability" under the ADA.

### 2.  Defendant's Non-Discriminatory Reasons and Plaintiff's Evidence of Pretext

Defendant claims that it terminated plaintiff because he violated the LCA.  Specifically, defendant contends that plaintiff violated the LCA by failing to (1) "timely report to UHS for a drug screen" and (2) "follow the treatment plan of his treating provider, i.e., Lott refused to enroll in the GOP after he graduated from the IOP, and he *sua sponte* resumed taking Adderall, a medication that The Foundation instructed him 'must be avoided' absent a 'severe medical emergency.'"  Def.'s Brief, 11.  However, plaintiff contends that defendant's articulated reasons for terminating him are pretextual and that he was "ultimately terminated because of his substance use disorder and need for medical leave to enter a rehabilitation facility."  Pl.'s Mem. Opp., 1.

To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  In other words, plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). The Court evaluates whether plaintiff has adequately demonstrated pretext with respect to each of defendant's proffered non-discriminatory reasons in turn.

a.   Whether Plaintiff Failed to Timely Report for a Drug Screen

With respect to plaintiff's alleged failure to timely report to UHS for a drug screen, the record supplies two versions of the story: Nurse Practitioner Barbara Symons's and plaintiff's. Symons claims in her affidavit that plaintiff evaded her request for him to come in for a drug screen, and that rather than reporting at 7:30 AM on September 7th as agreed, he did not report until after 10 AM that day.  *See* Part II.D *supra*.  Plaintiff, on the other hand, testified in his deposition that he never agreed to report at 7:30 AM and asserted that he complied with Symons's request at his earliest availability.  *See id*.  Kristan Davis's affidavit supports defendant's argument that plaintiff was available to report to UHS before 10 AM.  Nevertheless, a genuine dispute remains as to whether by reporting after 10 AM, plaintiff violated the terms of the LCA.

Plaintiff acknowledged that in signing the LCA, he implicitly agreed to "report for testing as soon as possible."  Def.'s SMF ¶ 85; *see* Lott Dep. 197:19-198:12.  However, the terms of the LCA do not mention timeliness and provide no guidance as to what would constitute a tardy reporting.  Thus, to resolve this dispute and determine whether plaintiff had in fact failed to timely report to UHS for a drug screen, the Court would have to assess the relative credibility of Symons's and plaintiff's accounts, which would be improper at this stage in the litigation.  At the summary judgment stage, "'a court is not to weigh the evidence or make credibility determinations'; these are tasks left for the fact-finder."  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003) (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).  The Court therefore concludes that the issue of whether plaintiff failed to timely report to UHS for a drug screen presents jury questions.

b.   Whether Plaintiff Failed to Follow the Treatment Plan of his Provider

Defendant's second proffered reason for terminating plaintiff—that he failed to comply with his treatment plan because he refused to enroll in the GOP after he graduated from the IOP and resumed taking Adderall—also presents jury questions.  As discussed *supra*, plaintiff denies that his enrollment in the GOP was an initial condition of his treatment plan at The Foundation. He also testified that when he later learned of this recommendation, he took steps to comply.  *See* Pl.'s Resp. Def.'s SMF ¶ 145.  The terms of the LCA provide that plaintiff would "follow the program of treatment set forth by his treating provider" but do not mandate any particular provider or duration of treatment.  *See* Def.'s Ex. 27.  Further, the only evidence in the record that provides any detail regarding plaintiff's treatment plan, The Foundation's welcome packet, does not indicate whether plaintiff was to enroll in the GOP or the IOP, or both consecutively. *See* Def.'s Ex. 21.  Thus, on the present state of the record the Court concludes that a reasonable jury could find that plaintiff fully complied with his treatment plan by participating only in the IOP.

With respect to defendant's claim that plaintiff violated the LCA by taking Adderall, plaintiff testified that he abstained from taking Adderall during his enrollment in the IOP and that after he completed the IOP, he believed that he could resume taking it to treat his ADHD. *See* Lott Dep. 207:2-21.  Defendant argues that because Adderall was prohibited by The Foundation, plaintiff violated the LCA by taking it, even after completing the IOP.  However, aside from The Foundation's policy, defendant does not provide any evidence that otherwise indicates that plaintiff's employment was conditioned upon his abstaining from his prescribed medication.

The Court therefore determines, based on the present state of the record, that defendant's claims that plaintiff violated the LCA—by failing to enroll in the GOP and by taking Adderall—are based on disputed material facts.  Accordingly, a factfinder could reasonably disbelieve the defendant's articulated nondiscriminatory reasons for terminating plaintiff and plaintiff could carry his burden of proving pretext.  In light of the viability of plaintiff's claims supporting his *prima facie* case of disability and the weaknesses to which he points in defendant's proffered non-discriminatory reasons for terminating him, the Court denies defendant's Motion to the extent that it seeks summary judgment on plaintiff's discrimination claims.

### B.  Plaintiff's Retaliation Claims Under the ADA, PHRA and FMLA

Plaintiff further alleges that he was retaliated against for taking FMLA leave and for requesting to utilize Adderall.  *See* Pl.'s Mem. Opp., 27.  His retaliation claims under the ADA, PHRA and FMLA are "appropriately subject to the same evaluation."  *Williams*, 2018 WL 4491337, at *12 (analyzing retaliations claims under the ADA, PHRA and FMLA together).  To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he or she engaged in a protected activity, (2) the employer took an adverse action against him or her, and (3) there is a causal link between the protected activity and the adverse action.  *See Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).  If the plaintiff establishes these elements, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action."  *Williams*, 2018 WL 4491337, at *12.  If the employer satisfies that burden, the plaintiff must then prove that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process."  *Id*. (internal citations omitted).

Plaintiff alleges that by requesting FMLA leave and taking Adderall as treatment for his ADHD, he sought reasonable accommodations for his disabilities.  *See* Pl.'s Mem. Opp., 17. Requests for accommodations are protected activities under the ADA.  *See Shellenberger v. Summit Bancorp*, 318 F.3d 183, 190 (3d Cir. 2003).  However, as discussed *infra* Part IV.C, the record is insufficient to support a determination as to whether plaintiff's purported request to take Adderall constituted a request for an accommodation.  Thus, the Court will analyze plaintiff's retaliation claims only as they pertain to his request for FMLA leave.

> 1.  *Plaintiff's* Prima Facie *Case*

By invoking his right to take FMLA leave, plaintiff engaged in a protected activity.  *See Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014).  Additionally, is undisputed that plaintiff's termination constituted an adverse employment action.  Thus, the Court focuses its analysis on whether plaintiff has sufficiently demonstrated causation.

The Third Circuit recognizes a variety of means for showing causation, including an "unusually suggestive" temporal proximity between the protected activity and the adverse action. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008) (finding suggestive temporal proximity in three-day period); *see also Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) (finding temporal proximity in a period of "less than three months").  A plaintiff may also show causation through "a pattern of antagonistic conduct against the plaintiff subsequent to his protected conduct."  *Schlegel v. Koteski*, 307 F. App'x 657, 661-62 (3d Cir. 2009).  Plaintiff invokes both of these means—temporal proximity and a pattern of antagonism—to demonstrate causation.

With respect to temporal proximity, plaintiff states that he was terminated on September 12, 2016, less than two months after he returned from FMLA leave, on August 1, 2016.  *See* Pl.'s

Mem. Opp., 28.  Regarding the "pattern of antagonism,"  plaintiff alleges that, based on his

interactions with O'Connor, defendant "demonstrated a pattern of hostility and animosity toward

[him]. . . ."  *Id*. at 29.  Plaintiff contends that, from their first interaction, when he disclosed his

methamphetamine addiction on June 15, 2016, "[i]t was clear to [him] that O'Connor harbored

animosity toward him and others who struggled with addition [sic], and he observed obvious

disdain displayed on her face as he answered her questions."  *Id*.  Further, "[f]ollowing

[p]laintiff's return to work on August 1, 2016, O'Connor engaged in a concerted effort to find

any possible way to terminate [p]laintiff's employment based on his former addiction issues and

engagement in treatment for the same."  *Id*. at 30.  Defendant responds, in short, that O'Connor

was just doing her job and that plaintiff "cannot point to any person at TJU who made any

derogatory comments to [plaintiff] for requesting an accommodation."  Def.'s Brief, 26.

At the summary judgment stage, plaintiff must only provide "evidence sufficient to

support an inference by the trier of fact of a causal link" between his taking FMLA leave and his

termination.  *Fasold*, 409 F.3d at 190.  Plaintiff's evidence of temporal proximity—that he was

terminated less than two months after returning from FMLA leave—is within the range that the

Third Circuit has deemed indicative of causality.  *See id*.  This evidence, combined with

plaintiff's testimony regarding O'Connor's attitude toward him, is sufficient to support an

inference of a causal link.  Thus, the Court next evaluates whether a reasonable jury could find

that defendant's non-retaliatory reasons were pretextual.

### 2.   *Defendant's Non-Retaliatory Reasons and Plaintiff's Evidence of Pretext*

Defendant's non-retaliatory reasons for terminating plaintiff are the same as those

proffered in response to plaintiff's discrimination claims,—namely, that he violated the LCA by

failing to enroll in the GOP and by taking Adderall.  *See* Part IV.A.2 *supra*.  As previously

explained, the material facts underlying both of these alleged violations are disputed and plaintiff

has provided sufficient evidence from which a factfinder could determine that his actions did not

constitute violations of the LCA.  Accordingly, the Court concludes that a reasonable jury could

disbelieve defendant's proffered non-retaliatory reasons and denies defendant's Motion to the

extent that it seeks summary judgment on plaintiff's retaliation claims.

### C.  Plaintiff's Failure to Accommodate Claims Under the ADA and PHRA

Plaintiff argues that defendant failed to accommodate him by refusing to allow him to use

Adderall, as prescribed by his primary care physician to treat his ADHD.  In requesting an

accommodation, an employee "must make clear that [he or she] wants assistance for his or her

disability."  *See Taylor*, 184 F.3d at 313.  The employer must have "enough information" to

know of the protected trait and the "desire for an accommodation," or "circumstances must at

least be sufficient to cause a reasonable employer to make appropriate inquiries about the

possible need for an accommodation."  *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332

(3d Cir. 2003).

Plaintiff claims that "on September 12, 2016, [he] advised O'Connor of his need to utilize

Adderall as treatment, provided O'Connor with his prescription bottle as proof, and requested the

ability to utilize Adderall as an accommodation."  Pl.'s Mem. Opp., 28 n.7.  On the other hand,

defendant asserts that plaintiff "never asked TJU to allow him to restart Adderall and never

informed TJU that his PCP or any other medical professional or individual from The Foundation

thought that he could or should restart Adderall despite his methamphetamine addiction."  Def.'s

Brief, 29.  Defendant further contends that plaintiff's argument fails because at the time of

plaintiff's purported request for this accommodation, he had already engaged in conduct for

which he could have been terminated—taking Adderall in violation of The Foundation's

policy—and that such a request would have been unreasonable in light of his history of methamphetamine addiction. *Id.* 31-32.

The Court denies summary judgment with respect to plaintiff's failure to accommodate claim for the following reasons. First, given the conflicts in plaintiff's and defendant's accounts, there is a genuine dispute as to whether plaintiff requested an accommodation during his September 12th meeting with O'Connor. At the summary judgment stage, the Court is not to weigh the evidence. *InterVest, Inc.*, 340 F.3d at 160. Second, even if the Court were to find that plaintiff requested an accommodation, the Court is unable to assess the reasonableness of this request at this stage. Such an assessment would turn on issues of material fact that the Court has already deemed disputed—namely whether, under the terms of the LCA, plaintiff was required to abstain from taking Adderall indefinitely, or whether he could resume taking Adderall after graduating from the IOP. These questions present issues of material fact which cannot be resolved on summary judgment. Accordingly, the Court denies defendant's motion for summary judgment with respect to plaintiff's failure to accommodate claim.

## V.     CONCLUSION

For the foregoing reasons, Defendant Thomas Jefferson University's Motion for Summary Judgment is denied.

An appropriate order follows.