## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES LOTT, | : | |
| *Plaintiff,* | : | **CIVIL ACTION NO.:** 18-4000 |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | Honorable Jan E. DuBois |
| *Defendant.* | : | **JURY TRIAL DEMANDED** |

### PLAINTIFF'S PRETRIAL MEMORANDUM

Plaintiff, James Lott, by and through his counsel, Sidney L. Gold & Associates, P.C., hereby submits Plaintiff's Pretrial Memorandum in accordance with the Court's Order dated November 20, 2020 as follows:

### I.    STATEMENT OF THE NATURE OF THE ACTION

Plaintiff asserts claims against the Defendant for disability discrimination, failure to accommodate, and retaliation for requesting a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA") and Pennsylvania Human Relations Act ("PHRA"). Plaintiff also asserts a claim of retaliation for exercising his rights under the Family and Medical Leave Act ("FMLA").

The jurisdiction of this Court is invoked, and venue is proper in this district, pursuant to 28 U.S.C. §1331 and §1391 as Plaintiff's claims are substantively based on the ADA and the FMLA.  The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1367 to consider Plaintiff's claims arising under the PHRA.

### II.    STATEMENT OF THE FACTS

#### A.    Plaintiff's Employment Background with Defendant

Plaintiff began his employment with Jefferson University Physicians ("JUP") in or about November 2011. Plaintiff held several positions before transferring to the position of Training

and Documentation Specialist with Thomas Jefferson University ("Defendant") in April or May of 2015. Plaintiff initially reported directly to Matt Ernst upon commencing the Training and Documentation Specialist position. In April 2016, in addition to his ordinary job responsibilities, Plaintiff began serving as Learning Management Systems Manager and earned a corresponding increase to his compensation.

In his role as Training and Documentation Specialist, Plaintiff was primarily responsible for managing Defendant's learning management system, implementing Epic, a software system for the management of patient records, and presenting employee training and information sessions. Throughout the duration of his employment, Plaintiff consistently earned positive performance reviews. On January 4, 2016, Plaintiff began reporting directly to Kristan Davis ("Davis"), Training and Documentation Manager.

**B.      Plaintiff Seeks Treatment for Substance Use Disorder**

By way of background, Plaintiff has a history of methamphetamine addiction. Beginning in January 2016, Plaintiff began having attendance difficulties resulting from his escalating abuse of methamphetamine. In connection therewith, Davis counseled Plaintiff and issued attendance related disciplinary warnings in May and June 2016.

As Plaintiff's substance abuse related attendance issues continued, Plaintiff realized that he needed to seek treatment. As such, on June 14, 2016, Plaintiff submitted a request for medical leave through Cigna, Defendant's third-party FMLA administrator. The following day, on June 15, 2016, Plaintiff met with Colleen Powell ("Powell"), HR Business Partner, during which he disclosed to her that he was suffering from methamphetamine addiction and intended to take medical leave to undergo treatment for the same.

Later the same day, following his meeting with Powell, Plaintiff reported to University Health Services ("UHS"), where he was required to undergo a fitness for duty evaluation with Dr. Ellen O'Connor ("O'Connor"), Medical Director, as well as a drug screening. During said evaluation, Plaintiff disclosed to O'Connor his medical history of ADHD, anxiety, and depression, and informed her of his current use of Adderall and Klonopin as treatment for the same. Plaintiff also disclosed his current and past history of methamphetamine addiction. At the conclusion of the meeting, O'Connor referred Plaintiff to Defendant's Employee Assistance Program.

On June 20, 2016, Plaintiff met with Deborah Dix ("Dix"), an employee of First Call, Defendant's contracted Employee Assistance Program. During their initial conversation, Plaintiff provided information regarding his substance abuse and employment with Defendant, and Dix recommended that Plaintiff obtain treatment with The Livengrin Foundation ("Livengrin"), one of First Call's recommended treatment facilities. Plaintiff understood that Dix would serve as an intermediary between Defendant and Livengrin.

### C.    Plaintiff Enrolls in Treatment with The Livengrin Foundation

Plaintiff first sought treatment with Livengrin on June 22, 2016. During his intake meeting, Livengrin recommended to Plaintiff that he participate in its intensive outpatient program, and advised Plaintiff that any further treatment recommendations, such as a recommendation to continue treatment through a general outpatient program, would be determined upon completion of said program. As part of his treatment during the intensive outpatient program, Plaintiff was required to refrain from taking Adderall and Klonopin. During his treatment, Plaintiff attended treatment approximately three times per week.

On July 20, 2016, Plaintiff met with O'Connor for a fitness for duty examination and drug screen in connection with his anticipated return to work, as Livengrin had cleared Plaintiff to do so. At that time, Plaintiff remained in the intensive outpatient program through Livengrin, and, as such, was not taking Adderall or Klonopin. On the same date, Plaintiff and O'Connor agreed that he would return to work on August 1, 2016. Upon his return to work, Defendant issued Plaintiff an Employee Disciplinary Action relating to his attendance prior to his leave for treatment. Further, Plaintiff was required to sign a Last Chance Agreement setting forth conditions on his continued employment with Defendant.

Thereafter, Plaintiff performed his job responsibilities competently and diligently, and received a positive performance evaluation on August 15, 2016. Following his return, Plaintiff did not have a single attendance or performance issue. Indeed, Davis testified that upon his return from treatment, Plaintiff "seemed motivated," "seemed organized," and "was doing a good job."

**D.     Plaintiff Successfully Completes His Treatment Program**

On August 15, 2016, Plaintiff successfully completed the intensive outpatient program with Livengrin. Near the end of the program, Anthony Morgan, Plaintiff's primary therapist, commenced a leave of absence, which resulted in confusion as to Plaintiff's continued treatment needs. Importantly, at that time, Plaintiff had not yet received a recommendation from Livengrin to continue his treatment through a general outpatient program. Moreover, Plaintiff understood that he was permitted to resume taking prescribed Adderall after his completion of the intensive outpatient program with Livengrin. As such, Plaintiff resumed utilizing his prescribed Adderall to assist him with the completion of his job duties, which he found difficult to perform without.

### E.       Plaintiff is Requested to Report for a Drug Screening

On September 6, 2016, Plaintiff received a voicemail message requesting that he report to University Health Services for a drug screening. Upon his receipt of said voicemail, Plaintiff returned the call and asked if he could report after 3:00 PM that day, as he had several meetings to attend.[1]   In response to his request, Barbara Symons ("Symons"), a nurse practitioner employed by UHS, instructed Plaintiff to report for the screening the following day.[2] Had Symons requested that Plaintiff report on September 6, 2016, he absolutely would have done so, and there was nothing nefarious about his request.

The following morning, on September 7, 2016, Plaintiff sent a text message to Davis advising that he had to report to UHS that day for a drug screening. Although Plaintiff clearly intended to report to UHS that day, at around 10:00 AM, Aaron Sniderman ("Sniderman"), Human Resource Business Partner, approached Plaintiff at his desk, directed him to report to UHS immediately, and advised that he could be in violation of his Last Chance Agreement. Plaintiff did so immediately and underwent a drug screening that morning.[3]

### F.       Plaintiff Receives a Recommendation to Continue Treatment in a General Outpatient Program

On September 7, 2016, Plaintiff called Livengrin to follow up on his treatment plan and learned for the first time of Livengrin's recommendation that he continue his treatment through a general outpatient program. Upon reviewing Livengrin's treatment schedule, Plaintiff realized that the schedule would conflict with the college courses that he was taking in the evening

---

[1] In his deposition, Plaintiff could not recall the precise time(s) that he offered to report for the drug screen on said date. The fact that Plaintiff offered to report for screening on said date is, however, undisputed.

[2] Plaintiff vehemently denies that Symons instructed him to report to UHS for screening on September 7, 2016 at 7:30 AM. Plaintiff testified that he absolutely would have reported at 7:30 AM had he been instructed to do so.

[3] On September 7, 2019, O'Connor falsely informed Dix that Plaintiff did not show for his drug screening, despite the fact that he did report.

through Jefferson University, and as such he researched other treatment facilities, including Rehab After Work. Plaintiff informed both O'Connor and Dix of the conflict and his intention to consider continuing treatment through a different facility. Plaintiff did, in fact, seek treatment with Rehab After Work on September 15, 2016.

Importantly, Plaintiff's Last Chance Agreement did not state that Plaintiff was required to treat only with Livengrin, nor did Defendant communicate to him that he could not change treating providers. Indeed, O'Connor testified that Defendant does not mandate any specific treatment facility, meaning an employee has the ability to choose the best fit. Importantly, unlike Livengrin, Rehab After Work had no prohibition on the utilization of Adderall for its patients in recovery.

**G.      Plaintiff Tests Positive for a Prescribed Medication and Defendant Terminates Plaintiff's Employment**

On September 12, 2016, O'Connor notified Plaintiff that he had tested positive for Adderall during his drug screening on September 7, 2016. Plaintiff reminded O'Connor that he utilized Adderall as prescribed as treatment for ADHD, and provided his prescription bottle to O'Connor as verification. Nonetheless, O'Connor accused Plaintiff of violating the Last Chance Agreement and sent him home from work.

On September 21, 2016, Sniderman and O'Connor terminated Plaintiff's employment, allegedly for violating his Last Chance Agreement. Significantly, prior to deciding to terminate Plaintiff's employment, Sniderman did not have a single conversation with Plaintiff regarding the results of his drug screening, whether the substance for which he tested positive was prescribed, or the status of his treatment. Moreover, Sniderman testified that he was aware at the time of the termination decision that Plaintiff had not tested positive for an illegal substance, but rather a prescribed medication.

**H.      Defendant's Pattern of Discrimination and Retaliation Against Plaintiff.**

Defendant demonstrated a pattern of hostility and animosity toward Plaintiff from the moment that he disclosed his substance use disorder until the date of his termination. From the very first occasion on which Plaintiff met with O'Connor and disclosed his methamphetamine addiction on June 15, 2016, O'Connor appeared agitated and engaged in blatantly rude conduct. It was clear to Plaintiff that O'Connor harbored animosity toward him and others who struggled with addition, and he observed obvious disdain displayed on her face as he answered her questions. As further evidence of O'Connor's animosity, Plaintiff met another employee of Defendant during his treatment with Livengrin who disclosed that she too had been treated poorly by O'Connor in connection with her treatment for alcohol abuse.

Moreover, the fact that Plaintiff was subjected to a retaliatory Last Chance Agreement upon his return to work from substance use disorder treatment is undisputed. The testimony in this matter evidences the fact that Plaintiff would have never been placed on the LCA had he not suffered from substance use disorder. Indeed, Sniderman testified that the only reason why the Plaintiff was issued the LCA was because of his need to seek treatment for substance abuse, and further testified that it is Defendant's practice to issue a LCA to any employee who undergoes treatment for drugs or alcohol. As further evidence thereof, Davis testified that her understanding was that Plaintiff was placed on a LCA due to the "problem" he was having at the time, specifically, his addiction issues. Importantly, O'Connor, the same individual who was overtly hostile to Plaintiff's disclosure of his substance use disorder and need for treatment, was directly involved with Plaintiff's placement on the LCA.

Following Plaintiff's return to work on August 1, 2016, O'Connor engaged in a concerted effort to find any possible way to terminate Plaintiff's employment based on his former addiction

issues and engagement in treatment for the same. On August 11, 2016, O'Connor contacted Dix out of the blue and stated that the medication prescribed to Plaintiff by his physician, namely, Adderall and Klonopin, were not in the best interest of a recovering addict. Significantly, at that time, Plaintiff was still treating with Livengrin in the IOP and, as such, was not taking said medications. Dix passed on O'Connor's alleged medication concern to Morgan, Plaintiff's therapist, who reiterated that Plaintiff was in compliance with his treatment. O'Connor's telephone call was completely unsolicited and is a precursor to her future attempts to terminate Plaintiff.

Thereafter, on September 7, 2016, O'Connor called Dix and reported that Plaintiff had not shown for a drug screening. As discussed above, O'Connor's claim to Dix is a blatant fabrication and O'Connor admits that Plaintiff did, in fact, report for a drug screening on said date. O'Connor also informed Dix on said date that she had informed HR that Plaintiff had violated his LCA. Moreover, O'Connor sent an email to Sniderman which began, "[H]ere is the scenario to consider for a violation of the contract." In said e-mail, which is riddled with statements that Plaintiff has denied and disputed, O'Connor proceeded to lay out two different scenarios to attempt to justify the termination of Plaintiff's employment. O'Connor's e-mail of said date makes clear that she was highly motivated to find an excuse to end Plaintiff's employment with Defendant.

On September 12, 2016, Plaintiff advised O'Connor that he had a substance abuse evaluation scheduled with Livengrin that week to evaluate his continued treatment in GOP and also that he intended to discuss with Dix alternative GOP treatment facilities, such as Rehab After Work, that would better fit with his schedule. Nonetheless, as further evidence of

O'Connor's discriminatory agenda, on September 15, 2016, O'Connor requested a letter from Livengrin stating that Plaintiff was not compliant with treatment.

Despite Defendant's attempt to distance O'Connor from the termination decision, Defendant admitted in its Responses to Plaintiff's First Set of Interrogatories that both O'Connor and Sniderman were involved in the decision to terminate Plaintiff's employment. Relying upon Sniderman alone to justify Plaintiff's termination fares no better. In his deposition, Sniderman testified that he did not believe drug addiction, or former drug addiction, to be a disability under the ADA, and testified that an employee of Defendant could not request an accommodation for the same.

## III.    MONETARY DAMAGES

Plaintiff seeks back pay in the amount of $187,000. Had Plaintiff remained employed by Defendant from September 21, 2016 through the present (February of 2021), he would have earned approximately $322,000. Following the termination of his employment, Plaintiff has earned approximately $135,000 in subsequent employment. In additional to back pay, Plaintiff also seeks damages for front pay in an unliquidated amount, compensatory damages for emotional distress in an unliquidated amount, punitive damages in an unliquidated amount, and liquidated damages in the amount of $187,000 as allowable under the FMLA.  Plaintiff also seeks reasonable attorney's fees and costs following judgment entered in his favor.

## IV.    TRIAL WITNESSES

1.    Plaintiff, James Lott

2.    Aaron Sniderman

3.    Colleen Powell

4.    Dr. Ellen O'Connor

5.    Kristan Davis

6.    Debra Dix

## V.    EXHIBIT LIST

Please see attached Exhibit List.

## VI.    NUMBER OF DAYS REQUIRED FOR TRIAL

The parties anticipate that the trial of this matter will take 3-5 days.

## VII.    SPECIAL COMMENTS

None at this time.

## VIII.    EVIDENTIARY OBJECTIONS

| | |
|---|---|
| D-2 (TJU00161-00162): | Fed R. Civ. P. 401, 403 |
| D-3 (TJU00322): | Fed R. Civ. P. 401, 403 |
| D-4 (TJU00571-00572): | Fed R. Civ. P. 401, 403 |
| D-6 (TJU00239): | Fed R. Civ. P. 401, 403 |
| D-7 (TJU00214): | Fed R. Civ. P. 401, 403 |
| D-8 (TJU00576): | Fed R. Civ. P. 401, 403 |
| D-9 (TJU00148-00149): | Fed R. Civ. P. 401, 403 |
| D-10 (TJU00186): | Fed R. Civ. P. 401, 403 |
| D-11 (P0004-0005): | Fed R. Civ. P. 401, 403 |
| D-12 (TJU00598): | Fed R. Civ. P. 401, 403 |
| D-13 (TJU00486-00488): | Fed R. Civ. P. 401, 403 |
| D-14 (TJU00514): | Fed R. Civ. P. 401, 403 |
| D-24: | Fed R. Civ. P. 401, 403 |
| D-26 (P0002-P0003): | Fed R. Civ. P. 401, 403 |
| D-39 (TJU00391-392): | Fed. R. Civ. P. 801 |
| D-40 (TJU00385): | Fed. R. Civ. P. 801 |
| D-41 (TJU00383): | Fed. R. Civ. P. 801 |
| D-43 (TJU00369-371): | Fed. R. Civ. P. 801 |
| D-45 (TJU00270-00271): | Fed R. Civ. P. 401, 403 |
| D-46 (TJU00183): | Fed R. Civ. P. 401, 403 |
| D-47 (TJU00326): | Fed R. Civ. P. 401, 403 |
| D-48 (TJU00332, 00336): | Fed R. Civ. P. 401, 403 |
| D-49 (TJU00327): | Fed R. Civ. P. 401, 403 |
| D-50 (TJU00334): | Fed R. Civ. P. 401, 403 |
| D-51 (TJU00324): | Fed R. Civ. P. 401, 403 |
| D-52 (TJU00353): | Fed R. Civ. P. 401, 403 |
| D-53 (TJU00262-00263): | Fed R. Civ. P. 401, 403 |
| D-54 (TJU00354): | Fed R. Civ. P. 401, 403 |

| | |
|---|---|
| D-55 (TJU00355-00363): | Fed R. Civ. P. 401, 403 |
| D-56 (TJU00364-365): | Fed R. Civ. P. 401, 403 |
| D-57 (TJU00167): | Fed R. Civ. P. 401, 403 |
| D-58 (TJU00250): | Fed R. Civ. P. 401, 403 |
| D-59 (TJU00335): | Fed R. Civ. P. 401, 403 |
| D-60 (TJU00157-00158): | Fed R. Civ. P. 401, 403 |
| D-91 (TJU00368): | Fed R. Civ. P. 401, 403 |
| D-92 (TJU00481): | Fed. R. Civ. P. 801, 901 |
| D-96 (TJU00390): | Fed. R. Civ. P. 801, 901 |
| D-98 (TJU00389): | Fed. R. Civ. P. 801, 901 |
| D-100 (TJU00478): | Fed. R. Civ. P. 801, 901 |
| D-101 (TJU00388): | Fed. R. Civ. P. 801 |
| D-102 (TJU00384): | Fed. R. Civ. P. 801 |
| D-110 (TJU00521-00522): | Fed. R. Civ. P. 801 |
| D-111 (TJU00470): | Fed. R. Civ. P. 801, 901 |
| D-122: | Fed R. Civ. P. 401, 403 |
| D-133: (TJU00435-00436): | Fed. R. Civ. P. 401, 403 |
| D-135: | Fed. R. Civ. P. 801 |
| D-136: | Fed. R. Civ. P. 801 |
| D-137: | Fed. R. Civ. P. 801 |
| D-138: | Fed. R. Civ. P. 801 |
| D-139: | Fed. R. Civ. P. 801 |
| D-147: | Fed R. Civ. P. 401, 403 |
| D-149: (TJU00172-00173): | Fed R. Civ. P. 401, 403 |
| D-155: (TJU00246-00247): | Fed R. Civ. P. 401, 403 |
| D-156: (TJU00248-00249): | Fed R. Civ. P. 401, 403 |
| D-157: (TJU00253-00255): | Fed R. Civ. P. 401, 403 |
| D-160: | Fed R. Civ. P. 401, 403 |

Respectfully submitted,

SIDNEY L. GOLD & ASSOCIATES, P.C.

BY:    /s/ Jamie L. Ford, Esquire
       JAMIE L. FORD, ESQUIRE
       1835 Market Street, Suite 515
       Philadelphia, PA 19103
       (215) 569-1999
       Attorneys for Plaintiff

Dated:  February 5, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of Plaintiff's Pretrial

Memorandum to be served via ecf upon the following:

William A. Harvey, Esquire
Lee D. Moylan, Esquire
Paul G. Nofer, Esquire
Klehr Harrison Harvey Branzburg, LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Attorneys for Defendant

SIDNEY L. GOLD & ASSOCIATES, P.C.

BY:    /s/ Jamie L. Ford, Esquire
        JAMIE L. FORD, ESQUIRE
        1835 Market Street, Suite 515
        Philadelphia, PA 19103
        (215) 569-1999
        Attorneys for Plaintiff

Dated:  February 5, 2021